JOHN PAPA, Individually and in His Representative Capacity as President of the CSEA of Yonkers, Inc., et al., Appellants, v PAT RAVO, as City Manager of the City of Yonkers, et al., Respondents,

Second Department, August 20, 1979

## APPEARANCES OF COUNSEL

*Wekstein & Fulfree (Richard W. Fulfree* of counsel), for appellants.

*Eugene J. Fox, Corporation Counsel (Jane M. Maguire* of counsel), for respondents.

## OPINION OF THE COURT

MOLLEN, P. J.

This appeal brings before this court once again[1] the issue of whether employees hired under the Comprehensive Employment and Training Act of 1973 (CETA) are deemed to hold their positions subject to the State Civil Service Law, as persons included within the civil service of the State or of its subdivisions.

In February, 1977 the Yonkers City Manager, upon retirement of the former clerk, duly appointed a person to the only budgeted civil service position in the city for audit clerk, which position was then situated in the finance department, now known as financial services. The appointment being provisional, the local Civil Service Commission on March 8, 1977 requested the State Civil Service Department to conduct a promotional examination to fill the one vacancy in this position. The examination, noticed to examinees as a promotional examination to fill one vacancy for audit clerk, was held on April 8, 1978; and on August 8, 1978 the local Civil Service Commission established an eligible list for a four-year period, certifying three names to the city manager as the appointing authority.

Appellants (other than Mr. Papa) were on this list and three

---

1. See *Patrolmen's Benevolent Assn. of Newburgh, N. Y. v City of Newburgh* (67 AD2d 943), and *Papa v Ravo* (69 AD2d 1020, mot for lv to app den 47 NY2d 709).

of them were the persons certified to the city manager. Since the provisional appointee's name was not on the list, she was properly removed from the position. Prior to, and in some instances, subsequent to certification, however, 11 persons not on the eligible list, upon qualification by the local Civil Service Commission in respect to their CETA eligibility, were appointed to positions described as "temporary audit clerks CETA" in city departments other than the financial services department.

Appellants made due demand upon the city manager and the local Civil Service Commission, that these CETA appointees be dismissed and that appellants be appointed to the positions in their stead. Appellants alleged that the appointees, characterized as temporary or provisional, were continuing in these positions for eventual assimilation into permanent civil service positions despite provisions of the State Civil Service Law for termination of employment upon promulgation of an appropriate eligible list or upon expiration of the time limits set for employment of such temporary or provisional appointments. Upon respondents' refusal to act, appellants instituted the instant proceeding under CPLR article 78 in the nature of mandamus, seeking dismissal of the CETA audit clerks, decertification of their names on the city's payroll and appointment of appellants to the positions.

Special Term denied the petition on the ground that appellants' rights were not violated by the employment of the CETA program participants. The court noted that there had been no showing that respondents had failed to comply with CETA or the regulations promulgated thereunder, nor had they violated the State Civil Service Law by hiring employees under the CETA program to perform functions similar to, but not instead of those performed by regular civil service audit clerks.

I

An issue preliminary to the petition's basic challenge to the City of Yonkers' use of CETA participants faces appellants. It is conceded that the sole object of the promotional examination taken by appellants was for the vacant audit position in the financial services department, and that the CETA audit clerk positions, which are on transitional training lines, were outside the financial services department. Hence the prayer for relief insofar as it demanded appointment from

the resulting eligible list to the nonfinance department audit clerk positions was properly denied, apart from any consideration of CETA's impact on the State civil service requirements. Further, appellants sought the audit clerk positions as promotions from their regular civil service titles as city employees, and respondents correctly pointed out that they therefore could not meet the CETA requirement as to unemployed or underemployed status. Accordingly, no claim can be pressed successfully by appellants based on respondents' failure to make appointment to the nonfinance department audit clerk positions from the eligible list of August 8, 1978.

Appellants[2] instead direct their attention to what they consider to be the improper holdover status of the CETA audit clerks, whom they characterize as "temporary" or "provisional" as those terms are used in the Civil Service Law, as well as to the broader implications of CETA as it affects the State civil service system.

Appellants point to a memorandum of the State Civil Service Department addressed to all municipal civil service agencies, dated December 23, 1974, which states that CETA participants must be "treated" as "temporary" employees appointed pursuant to section 64 of the Civil Service Law, with the role of the local Civil Service Commission being to aid the participants in gaining permanent employment positions in the public sector. The memorandum, while suggesting that civil service eligible lists be used for competitive titles (such as audit clerks), also cautioned that the Federal provisions of CETA ultimately controlled eligibility requirements for employment under the CETA program.

On appeal appellants have not raised any issue regarding respondents' compliance with CETA's own requirements, which include explicit provisions to safeguard existing civil service positions and promotional opportunities. The issue they present is whether CETA conflicts with the State's civil service system by permitting the employment of municipal workers without strict compliance with civil service requirements that were designed to establish and maintain the

2. As to appellants' standing to raise this larger challenge, we note that appellants are all members of the collective bargaining unit for the City of Yonkers' civil service that alleges injury due to the CETA appointments, and that Mr. Papa additionally represents the union in his official capacity as president of the Civil Service Employees Association of Yonkers, Inc.

principle of hiring and promoting civil servants based on merit and fitness.

## II

The Comprehensive Employment and Training Act (US Code, tit 29, § 801 *et seq.)* succeeded the Emergency Employment Act of 1971 (formerly US Code, tit 42, § 4871 *et seq.)* and preceded the substantial revisions of Public Law 95-524, effective October 27, 1978 (92 US Stat 1912), resulting in the Comprehensive Employment and Training Act Amendments of 1978 (US Code, tit 29, ch 17, § 801 *et seq.).*

The purpose of this legislation has been to provide job training and employment opportunities for economically disadvantaged, unemployed and underemployed persons by a flexible and decentralized system of Federal, State and local programs (US Code, tit 29, § 801 [§ 801[3]]). Chapter 17 of title 29 of the United States Code, then as now, also codified provisions for manpower training and young persons' employment programs as well as for the National Commission for Manpower Policy.

Under CETA the Secretary of Labor has the power and authority to approve program plans submitted by prime sponsors such as States or units of general local government (§ 812 [§ 811]) for Federal financial assistance (§ 843 [§ 813]). The public sector jobs created by such funds are transitional and are designed to enable participants to move ultimately into public or private employment (§§ 843, 845, subd [b], par [4]).

(The temporary nature of the CETA positions is emphasized in the 1978 amendments, which prohibit payment of CETA funds for public service employment lasting more than 78 weeks in a five-year period, with limited exceptions [§ 824, subd (h), par (2)].)

Though the work performed may be substantially similar to existing civil service jobs, and benefits (except retirement plans) must be similar (§ 848, subd [a], par [4] [§ 823, subd (d), par (5); § 824, subd (k)]) CETA imposes on prime sponsors special hiring requirements based on residency (§ 845, subd [c], par [3] [§ 824, subd (a)]), and economic disadvantage (§ 845, subd [c], pars [7], [20] [§ 824, subd (b), par (1)]) that are not found in civil service systems, and requires them to review their hiring practices, including civil service requirements,

---

3. Numerical references in brackets are to the 1978 act.

with a view toward eliminating artificial barriers to public employment for CETA participants (§ 845, subd [c], pars [18], [21] [§ 813, subd (a), par (19); § 823, subd (a), par (4); § 824, subd (f)]).

CETA does provide for labor organization consultation in respect of employment plans proposed by prime sponsors (§§ 846, 848, subd [c] [§ 814, subd (a), par (1), cl (E)]), and specifically safeguards against government abuses of established civil service systems. Public employees are protected in their present positions from layoff or discharge and replacement by CETA workers (§ 845, subd [c], par [8]; § 983, subd [7] [§ 823, subd (e), par (2); § 824, subd (c), par (1)]), as well as from a reduction in the hours of nonovertime work, wages or employment benefits (§ 848, subd [a], par [1], cl [B] [§ 823, subd (e), par (2)]) or abridgment of promotional opportunities (§ 845, subd [c], par [24] [§ 824, subd (d)]) or of collective bargaining agreements (§ 845, subd [c], par [24] [§ 813, subd (a), par (18); § 825, subd (g)]). Furthermore, the positions must be jobs that would not have been created and funded had it not been for the financial assistance under CETA (§ 845, subd [c], par [25]; § 848, subd [a], par [1], cl [A] [§ 823, subd (e), par (1); subd (g), par (1), cl (B)]), and there can be no substituting of CETA funds for work that would otherwise be performed (§ 848, subd [a], par [1], cl [C]; § 983, subd [7] [§ 823, subds (e), (g), par (1), cl (A); § 824, subd (c), par (2)]), nor supplanting of non-CETA funds that would otherwise be available for the planning and administration of CETA programs (§ 983, subd [11] [§ 823, subd (g), par (1), cl (C)]).

The Secretary of Labor is charged with assuring compliance with these goals and requirements through regulations and decisions (§§ 846, 848, subds [a], [d] [§ 816, subds (c), (e); § 825, subd (g); § 828]).

The language of CETA is clearly indicative of Congress' concern as to the possible abuse of CETA funds in replacing civil servants. Whether the CETA provisions, extensive though they are in eliminating any adverse impact on civil servants, can coexist with the State Constitution is the concern here.

The mandate of section 6 of article V of the New York Constitution[4] is that appointments to the civil service of the

---

4. "Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and

State and its subdivisions be based on merit and fitness (the sole exception in both the Constitution and CETA being veteran status). Sections 40 and 35 of the Civil Service Law implement this mandate by dividing the civil service into classified and unclassified service, and the former into exempt, noncompetitive, labor and competitive classes (§ 40), and by requiring competitive positions (such as audit clerks) to be filled by competitive examination (§ 50). There was no such examination prior to filling the audit clerk positions with CETA employees. Therefore, if the CETA appointments are governed by the Civil Service Law the continued employment was unlawful.

The term "civil service" of the State and its subdivisions has been construed, however, as being inapplicable to certain special situations involving employment in the public sector; and if CETA appointments may thus be classified so as to exempt them from the term "civil service" as used in the New York State Constitution and Civil Service Law, there is no conflict between Federal and State law and no merit to appellants' contentions regarding the employment of the CETA audit clerks.

The term "civil service" is defined in subdivisions 5, 6, 7 and 8 of section 2 of the Civil Service Law:

"5. The 'civil service' of the state of New York or any of its civil divisions includes all offices and positions in the service of the state or of such civil divisions * * *

"6. The 'state service' shall include all offices and positions in the civil service of the state;

"7. The 'city service' shall include all offices and positions in the civil service of any city;

"8. The 'service of a civil division' shall include all offices and positions in the civil service of any subdivision of the state; and the term 'civil division' shall include within its meaning a city".

In construing the term "civil service", it has been held that government employees in some instances are not in the civil service because the governmental entity either is excepted under the Constitution (e.g., Sheriff's employees engaged in civil matters; see *McMahon v Michaelian,* 38 AD2d 60), or is neither a State, nor a subdivision thereof (e.g., a public benefit

---

fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive".

corporation such as the Niagara Frontier Bridge Commission, 1929 Opns Atty Gen 223; or the Dormitory Authority, 1951 Opns Atty Gen 152). Involved in these cases were such considerations as who appointed and removed, or who controlled and who paid the employees. In this instance, however, there is no issue of the applicability of the Civil Service Law to the City of Yonkers. The focus must shift from the status of the employer to the status of the employee.

The cases reveal that the term "civil service" has been interpreted to *not* apply to CETA employees hired by government entities in which the Civil Service Law (or its equivalent in other jurisdictions) applied *(Matter of Carritue v Beame,* 90 Misc 2d 504; see, also, *Patrolmen's Benevolent Assn. of Newburgh, N. Y. v City of Newburgh,* 67 AD2d 943; *Ragner v Zielke,* 86 Wisc 2d 542; *White v City of Paterson,* 137 NJ Super 220). These decisions cited a variety of factors that excluded CETA employees from the definition of civil servant as that term is used in State civil service statutes; primary among them is the fact that the funding for the positions was Federal, with the consequence that the positions were temporary and Federally regulated so as to have no adverse impact on the existing civil service employees' positions or opportunities. The fact that the work performed by the CETA employees was similar or identical to that performed by regular civil servants was irrelevant. Moreover, even were the Federal act lacking in explicitly stated provisions to protect State civil service programs, there is authority upholding the exclusion of public employees from the term "civil service" so long as no impact on civil servants was demonstrated, particularly if that employment was instituted by the governmental entity as a temporary solution to an emergency situation, such as work relief *(Gotbaum v Sugarman,* 78 Misc 2d 827; *Gotbaum v Rockefeller,* 74 Misc 2d 267, affd *sub nom. Gotbaum v Lindsay,* 43 AD2d 815; *Matter of Lorelli v Manhattan & Bronx Surface Tr. Operating Auth.,* 48 Misc 2d 944; *Matter of Social Investigator Eligibles Assn. v Taylor,* 268 NY 233; *Matter of Grosso v Moses,* 157 Misc 776, affd 243 App Div 765, mot for lv to app den 268 NY 725; see *Matter of Kraus v Singstad,* 275 NY 302).

We therefore conclude that temporary employment programs in the public sector, such as the CETA program in the City of Yonkers, do not involve appointments to the civil service as that term is used in the New York State Constitu-

tion and Civil Service Law. This conclusion is not altered by the fact that respondents utilize the civil service system to effectuate Congress' employment program under CETA. It would indeed seem only sensible for prime sponsors to use their administrative machinery already in place in channeling CETA participants into training and employment positions, whether within or without the public sector. Therefore, the challenged CETA appointments are not assailable on the ground that they are in violation of the State Constitution or any provisions of the State Civil Service Law, merely because their employment is administered through the Civil Service Commission.

■ ■ We note, as is pointed out in *Patrolmen's Benevolent Assn. of Newburgh, N. Y. v City of Newburgh* (67 AD2d 943, *supra),* that the administrative remedies provided pursuant to regulations of the Secretary of Labor under chapter 17 of title 29 of the United States Code would provide a more suitable method for resolution of disputes regarding any potential or actual adverse impact of CETA on civil service positions or opportunities. Indeed, not only does the Secretary of Labor possess expertise in assessing CETA abuses by prime sponsors, but the 1978 amendments to CETA (US Code, tit 29, § 816, subd [a], par [1]) specifically require each prime sponsor to establish grievance procedures for its CETA programs to handle complaints by interested persons (although another provision makes it clear that the remedies thus created do not preclude recourse to any other remedies available by Federal, State or local law [US Code, tit 29, § 816, subd *(1)]).* Insofar as this appeal is concerned, no such impact was demonstrated; appellants basically object to the concept of permitting the City of Yonkers to employ persons in public service positions without competitive examinations; however, it is our opinion that, in sense of purpose, and in implementation, the CETA program is compatible with the New York State Constitution and the Civil Service Law. Thus, we find no merit to appellants' contentions. Accordingly, we affirm.

HOPKINS, TITONE and MANGANO, JJ., concur.

Judgment of the Supreme Court, Westchester County, entered December 14, 1978, affirmed, with $50 costs and disbursements.